CONTINENTAL TRUST CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FOURTH NATIONAL BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1944, 1945. Promulgated June 24, 1927.

1. Losses on account of worthless debts and investments determined.

2. The evidence fails to establish that the Fourth National Bank owned directly or controlled through closely affiliated interests, all or substantially all of the stock of the trust company during 1918 and 1919.

3. Value of intangible assets of a trust company purchased by a national bank determined for invested capital purposes.

4. Amount paid for acquisition of a going business held to be a capital expenditure, and allowed as a loss when the business was discontinued.

5. Architect's fee for building plans, which were never used and were abandoned within the taxable year, allowed as a deduction from gross income.

*George S. Jones, Esq.,* and *Fred L. Van Dolsen, Esq.,* for the petitioners. ·

*M. B. Leming, Esq.,* for the respondent.

These proceedings were consolidated for the purpose of hearing and decision. The deficiencies as determined by the Commissioner are

as follows: Continental Trust Co., 1918, $37,741.96, and 1919, $8,115.47; Fourth National Bank, 1918, $24,081.67, and 1919, $3,806.37; and Fourth National Bank as affiliated with the Continental Trust Co., for 1920, $7,712.24.

### FINDINGS OF FACT.

The Continental Trust Co. is a Georgia corporation, with its principal office in Macon, and was originally incorporated under the name of Continental Bank & Trust Co., its name having been changed from time to time to Home Savings Bank, Continental Bank & Trust Co., and Continental Trust Co., no change being made in its corporate existence. Unless otherwise indicated, it is referred to in these findings of fact as Trust Company. This corporation had been in existence since about 1890.

The Fourth National Bank is a National Banking Association with its office and place of business in Macon, Ga.

In 1914, the Trust Company agreed to act as liquidating agent for the Commercial & Savings Bank, located in Macon, Ga., hereinafter referred to as the Savings Bank, which had become involved in financial difficulties. Prior to entering into the aforesaid agreement, the Trust Company made an examination of the Savings Bank and found that its liabilities exceeded its assets. In order to make the Trust Company secure as to any deficit which might occur upon liquidation, the directors of the Savings Bank gave personal guarantees to the Trust Company in the aggregate sum of $100,000 and four national banks in Macon, Ga., additionally guaranteed the Trust Company to the extent of $73,000 against any loss by reason of any deficiency after exhausting the liability of the aforementioned directors on their guarantee. With these guarantees, totaling $173,000, the Trust Company proceeded to liquidate the Savings Bank, taking over the assets and assuming the liabilities. Among the assets of the Savings Bank were certain notes payable to it, to which were attached as collateral certain Eagle River Mining Co. bonds and coupons.

In 1915, the president of the Trust Company visited the properties of the Eagle River Mining Co. in Alaska and upon the basis of the information thus obtained by him, the Trust Company agreed with the makers of these notes, who had not paid the notes when they became due, to accept the bonds of the Eagle River Mining Co., which were attached as collateral, together with certain accrued interest, in satisfaction of the notes at a face value of $33,211.37. When settlement was made in 1915 with the four national banks and with directors of the Savings Bank on their aforementioned guarantees, the bonds of the Eagle River Mining Co. were shown at a valuation of $33,211.37 on the books of the Trust Company and so considered

by the Trust Company as an asset at this value in arriving at the amount which the aforementioned guarantors were ultimately required to pay. The guarantors were not required to pay the total of $173,000 guaranteed by them, though the difference between what they paid and $173,000 was less than $33,211.37.

At the time the aforementioned bonds were accepted by the Trust Company at a valuation of $33,211.37, a sale of the Eagle River Mining Co. properties was pending, though it never materialized. The Eagle River Mining Co. was not successful thereafter, and had not been for some time prior thereto, no interest being paid on the bonds from the time of their receipt by the Trust Company. In 1918, the properties of the Eagle River Mining Co. were finally abandoned and no amount was realized by the Trust Company on account of the Eagle River Mining Co. bonds held by it.

In its return for 1917, the Trust Company claimed as a loss $20,266.37 on account of the Eagle River Mining Co. bonds, this amount being charged off its books, and in 1918 the balance of $12,945 was likewise charged off and claimed as a deduction in its 1918 return.

The loss claimed in 1917 was disallowed by the Commissioner on the ground that it had not been determined in 1917; that the bonds were entirely worthless and that there was no provision in the Revenue Act of 1917 for allowing a partial loss of this nature. Subsequently, he disallowed the loss for 1918 on the ground that the worthlessness of the bonds was determined in 1917.

On February 19, 1918, Charles B. Lewis, J. N. Neel, A. T. Small and J. C. Walker, president and directors, respectively, of the Fourth National Bank, and George S. Jones, general counsel and director of the Fourth National Bank, made the following offer to R. J. Taylor, B. P. O'Neal, N. M. Block and A. W. Smith, president and directors, respectively, of the Trust Company:

We hereby offer One Hundred and Twenty-two ($122.00) Dollars per share for not less than two-thirds (2-3) of the entire capital stock of the Continental Bank & Trust Company, Macon, Georgia; this stock to be delivered to us or to our assigns, and the money to be paid as soon as the papers can be drawn and the stock gotten in and transferred and not later than the 25th instant. If this offer is accepted and the stock delivered to us, we also offer to purchase at the same price any or all of the balance of the stock which may be offered to us within thirty (30) days from this date.

Prior to the sale, neither the group offering to buy (Lewis and associates) nor the group accepting the offer (Taylor and associates) owned a majority of the stock in their respective banks.

The offer was accepted on the same day, and between this date and February 23, 1918, a majority of the stock of the Trust Company was delivered to Lewis and associates.

On February 23, 1918, the Trust Company conveyed to the Fourth National Bank all of its assets, except its fiduciary and trust business; the Fourth National Bank assuming all the liabilities of the Trust Company and paying to it the sum of $305,000 in cash. The tangible assets so transferred had a book value of $1,727,769.45 and the liabilities on the books of the Trust Company amounted to $1,450,-228.89. The cash received, $305,000, exceeded the net book value of the tangible assets, $277,540.56, by $27,459.44.

The tangible assets transferred, consisted of cash, deposits in banks, interest-bearing loans and physical and other properties, and the liabilities included commercial deposits, savings deposits, and other deposits and liabilities of a smaller character.

Subsequent to the sale of the majority of the stock of the Trust Company to Lewis and associates and sale of the assets of the Trust Company to the Fourth National Bank, the president of the Trust Company advised the stockholders of the Trust Company, in part, as follows:

The controlling interest in the Continental Bank & Trust Company has been sold to Mr. Charles B. Lewis and his associates representing the Fourth National Bank of Macon. The price paid for the majority stock was $122.00 per share. This represents a substantial premium over the book value of the stock, and is very considerably in excess of the price at which the stock has been selling for some time. In buying the control, the purchasers have contracted to purchase at the same figure and upon precisely the same terms all of the stock which may be offered to them on or before March 22, 1918. If you desire to avail yourself of this offer, you may forward your certificate, properly endorsed, to Mr. Charles B. Lewis, or present the same at the Fourth National Bank, and a check for $122.00 per share will be given.

After the sale of more than two-thirds of the stock had been consummated, the Board of Directors at a meeting held today passed a resolution transferring the assets of the Bank to the Fourth National Bank at a price which will net the stockholders $122.00 per share, the Fourth National Bank assuming as a part of the consideration all the liabilities of this Bank.

Thereafter and within a few days the remaining stockholders of the Trust Company availed themselves of the offer of Lewis and associates and the entire stock was thus acquired by these individuals.

In order to secure funds with which to acquire this stock, a loan of $305,000 was arranged by the cashier of the Fourth National Bank with certain banks in Atlanta, in the name of Lewis and associates, the shares of stock so purchased being attached to the notes of Lewis and associates as collateral, and the money received on the loan being used to acquire the stock. From time to time, new certificates of stock were issued to Lewis and associates and appropriate exchange made for the old stock which was pledged as collateral.

After the receipt by the Trust Company of the $305,000 for the sale of its assets, a dividend of $22 per share was declared by the

Trust Company, on the 2,500 shares of stock outstanding, which amount, $55,000, was used by Lewis and associates to reduce their liability on account of the money borrowed to purchase the stock of the Trust Company. Subsequently, the Trust Company retired 1,500 shares of its capital stock and as a result $150,000 was turned over to Lewis and associates, which was likewise used by them to reduce their liability on account of the aforementioned loan.

On July 24, 1918, Lewis and associates executed the following instrument:

The undersigned who are officers and stockholders of the Fourth National Bank of Macon, Georgia, hereby acknowledge that they hold 1,000 shares of the Capital Stock of the Continental Bank & Trust Company of Macon, Georgia, in trust for the sole pro rata use and benefit of the holders from time to time of the stock of the Fourth National Bank of Macon.

Said stock was issued to the undersigned who paid in to the Continental Bank & Trust Co. $100,000.00 therefor, and said stock is now attached as collateral security to certain notes for the sum of $100,000.00 principal signed by the undersigned, all dividends declared on said stock to be applied first to the payment of the interest on said notes and from time to time to the reduction of the principal of said notes and any renewals or extensions thereof or substitutions therefor. As soon as said notes are fully paid and the indebtedness incurred for the money used in acquiring said stock is fully paid, said stock shall then and thereafter continue to be held by the undersigned and their successors in this trust for the sole pro rata use and benefit of said stockholders of said Fourth National Bank and future dividends shall be distributed to said stockholders pro rata.

Their holdings of this stock shall, however, impose no obligation or liability upon either said Fourth National Bank or Macon or its stockholders.

After the retirement of 1,500 shares of the stock of the Trust Company, there were outstanding 1,000 shares of a par value of $100,000 and the indebtedness of Lewis and associates was likewise $100,000, which situation continued until April 28, 1920. At this time the stockholders of the Fourth National Bank paid in to the Fourth National Bank $150,000, its capital stock being increased from $350,000 to $500,000, and in addition paid in pro rata on their stock in the Fourth National Bank $100,000. This amount was paid to Lewis and associates who used this amount to liquidate the loan incurred to acquire the stock of the Trust Company, and each stockholder in the Fourth National Bank received one share of stock in the Trust Company in proportion to five shares held by him in the Fourth National Bank, the stock of the two banks being printed on the same certificate.

The interest on the money borrowed by Lewis and associates and the interest on all renewals of the notes given for the money so borrowed was paid out of dividends declared by the Trust Company up to and including April 28, 1920. The dividends were not sufficient to pay the entire interest which became due and in order to make up

the deficiency for 1918, the Fourth National Bank paid $350 of the said interest, including the same in its " Interest Paid " account and deducting it from its return for income and profits taxes for 1918.

After the sale of the stock of the Trust Company to Lewis and associates, the Trust Company did not engage in active trust business for a short time, but during the year 1918 this business was resumed, the activities being conducted in the same building with those of the Fourth National Bank. While the officers of the two banks were not identical from this time until April 28, 1920, in various instances executive officers in one bank held executive offices in the other bank. Salaries of the executive officers of the two banks, during this period, were either paid entirely by one bank or divided between the two banks, and the operations of the Trust Company were largely under the supervision of the Fourth National Bank.

For 1918 and 1919, the Trust Company and the Fourth National Bank each filed separate returns. When the Commissioner requested information as to the affiliated status of the two banks, the banks advised him on at least four occasions, during 1921 and 1922, that they considered that no affiliation existed between them as contemplated by the Revenue Act of 1918. The reasons of the banks for considering themselves not affiliated were stated in a letter, dated May 5, 1921, from the Trust Company to the Commissioner, as follows:

Replying to your valued favor of the 23rd ult., (Initial IT : SA : CR : E-FRM), we have not attempted to fill out questionnaires enclosed in your letter because the Continental Trust Company was not in any wise affiliated with any other company prior to April 28th, 1920.

For the year, 1917, the stockholders of the Continental Trust Company were entirely separate and distinct from the stockholders of any other corporation, so far as we are advised—certainly a majority of the stock was not owned by persons who constituted the majority of the stockholdings of any other corporation.

The same thing was true in 1918. About July, 1918, the name of the Continental Bank and Trust Company was changed to Continental Trust Company. The capital stock was reduced to $100,000.00 and from July, 1918, to April, 1920, all the stock of the Continental Trust Company was held and owned by C. B. Lewis, Geo. S. Jones and John C. Walker, who borrowed from independent banks the money invested in the stock. There was an oral agreement that the stockholders of the Fourth National Bank might acquire this stock by purchasing it at par from C. B. Lewis, Geo. S. Jones and John C. Walker. This purchase was not accomplished until April, 1920. Neither C. B. Lewis, Geo. S. Jones nor John C. Walker, nor the three of them together, represented a majority of the stockholdings of the Fourth National Bank or any other corporation, except that Chas. B. Lewis and Geo. S. Jones were majority stockholders of Cornell-Young Company, which was a construction company, having no connection whatever with the Continental Trust Company or the Fourth National Bank.

Under these facts, it seems to us that it is impossible to fill out the questionnaires, for, as we are advised there are no affiliations in contemplation of the Federal Income Tax Law.

The returns of the two banks for 1918 and 1919 were audited by the Commissioner on a separate basis, but after an examination by a revenue agent in 1923 on the basis of which examination an additional tax was proposed, the petitioners contended that they should be ruled affiliated.

The return of petitioners on a consolidated basis for the entire year 1920 was accepted by the Commissioner.

Among the assets of the Trust Company, which were transferred to the Fourth National Bank in the sale of February 23, 1918, were 40 shares of the capital stock of Lamar, Taylor & Riley Drug Co., which cost the Trust Company $13,500. On January 20, 1918, the Trust Company appreciated this stock on its books to a valuation of $32,000, on which basis it was carried on its books on February 23, 1918, and transferred to the Fourth National Bank.

In July, 1918, a national bank examiner, who was conducting an examination of the Fourth National Bank, advised the Fourth National Bank that it was in violation of the national banking statutes for this bank to carry this stock and that therefore, it should be disposed of. To meet this demand, the Fourth National Bank transferred the stock to the Trust Company, from which it had been acquired, and received therefor the amount paid, namely, $32,000.

This stock was sold by the Trust Company in 1920 for $32,000, and income reported in the consolidated return of the Fourth National Bank and the Trust Company on account of this sale of $18,000 ($14,000 instead of $13,500 being erroneously considered as the original cost to the Trust Company). The Commissioner reduced the consolidated taxable income for 1920 by $18,000 and made a corresponding increase in the taxable income of the Trust Company for 1918.

Another asset transferred to the Fourth National Bank in the acquisition of the assets of the Trust Company was a claim against E. N. Lewis and Mrs. Tero C. Amos which was considered by both parties at a valuation of $20,970.36 and was so carried on the books of the Fourth National Bank, although the claim was in litigation at the time taken over. Subsequently, during the latter part of 1918, the claim was settled out of court for $5,000 less than its agreed valuation at date of acquisition.

Among the liabilities of the Trust Company which were assumed by the Fourth National Bank on February 23, 1918, but which did not appear on the books of the Trust Company at that time, were two items of taxes for 1918 aggregating $3,117.72.

Rental items, totaling $2,125, on buildings previously occupied by the Trust Company which were not accrued at the date of the sale, but which were paid by the Fourth National Bank during 1918,

are now conceded by the Commissioner to have been properly treated by the Fourth National Bank in its return for 1918.

In 1919, the Trust Company decided to engage in the stock and bond business and entered into negotiations with W. M. Davis & Co., a firm composed of W. M. Davis and his brother, who were experienced stock and bond dealers in Macon. As a result of these negotiations, Davis and his brother discontinued their business and came to the Trust Company to carry on a similar business for this institution, bringing with them their lists of customers, office furniture and rotarystyle. W. M. Davis was elected vice president of the Trust Company and put in charge of its stock and bond business and his brother was employed in the same department.

In bringing Davis and his brother to the Trust Company, the Trust Company paid Davis $15,000, which it charged to expense and deducted from gross income in its income and profits-tax return for 1919. The minutes of the trust company authorizing this transaction are as follows:

It was moved and carried that the officers of the Continental Trust Company be authorized to absorb the stock and bond business of W. M. Davis Co., and to pay therefor $5,000 for the fixtures, instruments, and office supplies and paraphernalia, including mailing lists, and $10,000 for the good will of said business, and the partners therein; a contract to be made that the said W. M. Davis and E. S. Davis, or either of them, will not enter business of a like character, directly or indirectly, for a period of five years from the termination of service with the said Continental Trust Company.

It was moved and carried that W. M. Davis be elected Vice President of the Continental Trust Company.

The stock and bond business as conducted by Davis not only was unsatisfactory to the Trust Company, but also was severely criticized by the national bank examiner. As a result, Davis was released from his contract in 1920, his mailing lists and paraphernalia being returned to him because of no value to the Trust Company and no amount was received from him on account of the original payment of $15,000. The stock and bond business was thereupon discontinued.

In 1919, the Fourth National Bank acquired 164 shares of stock of the Crawford-Morrow Co., at a cost of $6,379.60, in the settlement of a debt due it. During 1919, the Fourth National Bank received $5,000 which was credited against the cost of this stock. The stock was turned over to the Trust Company in 1919 and charged off the books of the Fourth National Bank, a loss being claimed in the return of the latter bank for 1919 of $1,379.60. In 1920, $2,000 was received on account of this stock by the Trust Company and reported as taxable income by it in 1920.

The Fourth National Bank employed an architect in 1919 to prepare preliminary plans for the erection of a building, agreeing to pay the architect $6,000 for the preliminary plans, and, in the event

it should decide to erect the building, a total commission amounting to 5 per cent of the cost of the building, which it was estimated would cost $800,000. The preliminary plans were completed, but no final or working plans were asked for or prepared, the entire plan of erecting a new building being abandoned during 1919 when an estimate from a local contractor showed a probable cost much in excess of the architect's estimate. The proposed building was not erected then and has not subsequently been erected. During 1919, the Fourth National Bank paid the architect $6,000 and terminated the contract.

During 1919, E. F. Taylor became indebted to the Fourth National Bank in the sum of $54,707.66, which amount was still owing on February 28, 1920, when a national bank examiner instructed the petitioner to charge it off, which it did.

This indebtedness arose through dealings of Taylor in buying and shipping peaches. When shipments were made, he drew drafts on the consignees, which were cashed by the Fourth National Bank. In many instances the consignees dishonored the drafts because of the defective character of the peaches when received. A controversy then arose between Taylor and the carriers, Taylor contending that the loss was caused by the carriers in handling the peaches whereas the carriers contended that certain peach diseases, which were prevalent in that year, were responsible for the loss.

Taylor was a man without means and the only source from which anything could be realized on the amount due from him was from the amounts which might be secured from the claims which he had against the carriers. At the time the bank examiner instructed the bank to write off this amount, petitioner was of the opinion that a considerable portion of the debt due from Taylor would be realized, though prior to the end of 1920 it had determined that there was no basis for the claims of Taylor against the carriers and that no value attached thereto, beyond a nuisance value which might be assigned to them on account of the amount which the carriers might pay to get rid of the lawsuits.

During 1920, $2,120.50 was realized on account of a part of this indebtedness, but it was not credited to the indebtedness until 1921 when it was reported as income. During 1921 an attorney for Taylor settled with the carriers at a value less than 10 per cent of the amount claimed by him, which amount was accepted in final settlement of all these claims, the Fourth National Bank receiving $8,831.22 on account thereof, and returning the same amount as taxable income in 1921.

The Commissioner allowed the difference between the total indebtedness and the amount realized as a deduction from gross income in 1921.

LITTLETON : While some of the items listed below have various subdivisions, the major issues are as follows :

1. Loss on Eagle River Mining Co. bonds.

2. Affiliated status of the Fourth National Bank and the Trust Company from February 23, 1918, to April 28, 1920.

3. Manner in which cash paid by the Fourth National Bank to the Trust Company in excess of the net book value of the assets of Continental Trust Co. when these assets were acquired by the Fourth National Bank is to be treated in the returns of both banks.

4. Appreciation and disposition of Lamar, Taylor & Riley Drug Co. stock.

5. Loss on Lewis and Amos note.

6. Amount paid W. M. Davis & Co. when this firm discontinued its business and established a similar business for the Trust Company.

7. Architect's fee.

8. Loss on Crawford-Morrow stock.

9. Year in which debt of E. F. Taylor was determined worthless.

The first issue to be considered is the loss on Eagle River Mining Co. bonds. In order to decide the extent of the loss sustained in this connection, cost of these bonds to the Trust Company must first be ascertained.

These bonds came to the Trust Company as a result of its acting as liquidating agent for the Savings Bank, a bank in Macon, Ga., which became involved in financial difficulties. In 1914, before the Trust Company agreed to liquidate this bank, it ascertained that the assets were less than the liabilities and, therefore, was unwilling to undertake the liquidating contract by taking over the assets and assuming the liabilities until directors of the Savings Bank and four national banks in Macon agreed to be responsible for the estimated deficiency of $173,000.

Among the assets taken over were notes which had Eagle River Mining Co. bonds attached thereto as collateral. None of these notes were paid by the makers. In 1915, the president of the Trust Company became convinced, after an inspection of the properties of the Eagle River Mining Co., that at least the face value of the bonds and certain accrued interest could be realized in a sale of the properties. Accordingly, the Trust Company in 1915 agreed with the makers of the notes to surrender the notes and take the collateral at its face value of $33,211.37 in satisfaction of the notes. At the same time, or shortly thereafter, in making settlement with the guarantors under their contract, the Savings Bank was given credit for an asset equal to the face value of the bonds, namely, $33,211.37.

We are of the opinion that the foregoing amount, $33,211.37, represents cost of these bonds to the Trust Company. That they may not have been worth this amount is probably true, and it is certainly true that subsequent events show that the Trust Company

made a bad investment. The fact can not be overlooked, however, that the Trust Company considered the bonds were worth par, or more, when it relieved the makers of the notes from obligation thereon, and there is nothing to show that recovery could not have been had on the notes, apart from the value attaching to the collateral. Apparently the Trust Company was of the opinion that by acquiring the bonds, it could dispose of the Eagle River Mining Co. properties, and not only realize the face value of the bonds, but also have something left for the stockholders, of which it was one.

The fact that only the balance of the debt was charged off in 1918 does not bar the allowance of the entire amount in that year. As the Board said in the *Appeal of Mason Machine Works Co.*, 3 B. T. A. 745, this amounts to substantial compliance with the provision of the statute with respect to charging off the debt since at this time, 1918, the debt was finally determined to be worthless and finally charged off, the amount previously charged off in 1917 being, in effect, consolidated with the amount charged off in 1918.

We have found that the properties of the Eagle River Mining Co. were finally abandoned in 1918 and the bonds determined to be worthless in that year when they were charged off. A deductible loss was, therefore, sustained by the Trust Company in 1918 of $33,211.37.

The second issue involves the question of affiliation which arises on account of an acquisition of the stock of the Trust Company by certain stockholders of the Fourth National Bank.

On February 19, 1918, certain officers and directors of the Fourth National Bank who owned considerably less than a majority of the stock of the Fourth National Bank (otherwise referred to as Lewis and associates) made an offer to persons occupying similar positions with the Trust Company and who likewise owned a minority of the stock of the Trust Company (otherwise referred to as Taylor and associates) to pay $122 per share for not less than two-thirds of the capital stock of the Trust Company, which offer was accepted. Pursuant to this contract, all of the stock of the Trust Company was acquired by Lewis and associates within a few days, though only the controlling interest had been acquired by February 23, 1918. The financing of the acquisition of this stock was handled for Lewis and associates by the Fourth National Bank, though the loans made were in the name of Lewis and associates and new stock was issued in their names. On July 24, 1918, Lewis and associates executed a writing in which they stated that the stock issued to and held by them was held for the use and benefit of the stockholders of the Fourth National Bank, but that no obligation or liability was thereby imposed either upon the Fourth National Bank or its stockholders.

Lewis and associates continued to hold the entire stock of the Trust Company until April 28, 1920, at which time each stockholder of the Fourth National Bank contributed pro rata to an amount which was used to acquire the stock, and the stock was accordingly transferred to the various stockholders, so that thereafter each stockholder of the Fourth National Bank held one share of the stock of the Trust Company for every five shares of stock of the Fourth National Bank held by him.

Under these circumstances, the petitioners contend that the Fourth National Bank and the Trust Company were affiliated from February 23, 1918, to April 28, 1920, under the provisions of section 240 (b), Revenue Act of 1918, which reads as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

It is not set out specifically whether petitioners are contending for affiliation under subdivision (1) or (2) above, though from the argument advanced it appears that they are asking for affiliation under subdivision (1). In effect, their contention is that when the directors and officers of the Fourth National Bank acquired the stock of the Trust Company, they were acting for the Fourth National Bank and that the only reason the stock was not acquired by the bank itself was because of a prohibition against it in the national banking statutes.

It is not contended that the Fourth National Bank owned the stock of the Trust Company, but that there was control by the Fourth National Bank through closely affiliated interests. In the *Appeal of Canyon Lumber Co.*, 1 B. T. A. 473, and subsequent decisions, the Board interpreted the control as referred to in the statute to mean control of the voting rights of stock, whether it be legal or otherwise. The stock in this instance was held in the name of Lewis and associates and the record is silent as to how it was voted by these individuals. Certainly, from the record, it would appear the individuals had every right to vote it as they saw fit, and could exercise such complete control over it as flows from their complete ownership thereof. No evidence was introduced of any agreement that the Fourth National Bank may have had with the purchasers other than might be gathered from collateral circumstances surrounding the use and disposition of the stock after its acquisition. We are convinced that while there was a closeness of relationship—particularly as to operations—between the two banks and also between the individuals who purchased the stock and the Fourth National Bank, there is not sufficient shown to cause us to

reach the conclusion that there was present the control contemplated by the statute of the Fourth National Bank over the stock of the Trust Company from February 23, 1918, to April 28, 1920.

Petitioners further argue that, since they had oral agreements with the stockholders, they were acting for them and since they executed a declaration of trust on July 28, 1918, to the effect that they were acting for them, the act of the stockholders in finally acquiring the stock on April 28, 1920, must be termed a ratification which would relate back to February 23, 1918. To say that ratification could relate back in such a manner as to change the control as contemplated by the statute which had otherwise existed over a period of more than two years is going further than we feel called upon to go in this case. What the oral agreements were, we do not know, but we consider it significant that in the declaration of trust, the signers thereof set out that the "holding of this stock shall, however, impose no obligation or liability upon either said Fourth National Bank of Macon or its stockholders." Certainly, it would be extremely improbable for all obligations and liabilities with respect to ownership of the stock to attach to Lewis and associates and at the same time either the Fourth National Bank or its stockholders have full control of its voting rights.

Upon the whole record, therefore, the Board is of the opinion that the Fourth National Bank and the Trust Company were not affiliated from February 23, 1918 to April 28, 1920.

Our next consideration is the manner in which the excess of cash paid by the Fourth National Bank to the Trust Company over the net book value of the assets of the latter company shall be treated by both concerns as a consequence of the transaction of February 23, 1918, when the Fourth National Bank acquired the assets and assumed the liabilities of the Trust Company.

The excess in question, as shown by the books of the Trust Company, amounted to $27,459.44, and in addition there were liabilities which had accrued and which were assumed, but which had not been set up on the books of the Trust Company, in the amount of $3,117.72, which would reduce the net book value and increase the excess to $30,577.16.

First we will consider the situation with respect to the purchasing company, the Fourth National Bank. This bank contends that this amount was paid by it to acquire the business of the Trust Company, meaning by "business" primarily the old customers and depositors who thereby became customers and depositors of the Fourth National Bank, and that the amount paid represented an expense to it in the same manner that amounts which are paid from time to time to solicitors to secure new customers are considered an expense.

That it was expended to acquire the business, we agree is true, but we can not concur in the proposition that it should be treated as a deductible expense for 1918 by the Fourth National Bank. An important asset to any bank is its line of customers and depositors, as they constitute the very lifeblood of the institution. For reasons of conservatism, national banks are not allowed to carry good will on their books, but this does not alter the fact, as the Board stated in *Merchants National Bank* v. *Commissioner*, 6 B. T. A. 1167, that a national bank may have good will, or intangible assets, which may be recognized for invested capital purposes under the revenue acts.

The bank whose assets were purchased had been in existence since about 1890, and assets purchased consisted not only of tangible assets, but assets of every nature and description, exclusive of its trust and fiduciary business. Customers and depositors of the Trust Company became customers and depositors of the Fourth National Bank, representing several classes of deposits amounting to several hundred thousand dollars. Various officers in the Trust Company came over to occupy similar positions with the Fourth National Bank.

In view of the foregoing facts, we are of the opinion that the excess paid, $30,577.16, represented a sale by the Trust Company and a purchase by the Fourth National Bank of an intangible asset of at least this value and that it should be included in the invested capital of the Fourth National Bank from date of acquisition in this amount.

Since this asset was sold by the Trust Company, the question arises as to whether a profit was realized in the sale. From the evidence introduced by the Trust Company, both in the form of expert testimony and earnings, and invested capital of the Trust Company for five years preceding March 1, 1913, and for the years preceding February 23, 1918, we are convinced that the intangible value was not worth more on February 23, 1918, than on March 1, 1913, and that therefore no profit was realized in the sale to the Fourth National Bank.

We are of the further opinion that interest on the loan of Lewis and associates amounting to $350, which was paid by the Fourth National Bank, does not represent a deductible expense to this bank under the provisions of section 234(a), (1) and (2) of the Revenue Act of 1918, since it does not represent an ordinary and necessary expense, or interest paid or accrued within the taxable year on *its* indebtedness.

At the time of the aforementioned sale of assets, the Trust Company had certain stock of the Lamar, Taylor & Riley Drug Co., which cost the Trust Company $13,500, but which had been appreciated on its books to $32,000 and was sold to the Fourth National Bank at $32,000. During 1918, a national bank examiner instructed

the Fourth National Bank that it was in violation of the national banking statutes to hold this stock and it should dispose of it. Accordingly, the Fourth National Bank sold it back to the Trust Company for the price paid therefor, $32,000, which bank, in 1920, sold it for a like amount.

We have heretofore held that the two banks were not affiliated and consequently each must be dealt with on a separate entity basis. We must hold, therefore, that there were three separate sales involved in the foregoing transactions. In the first instance, stock which cost the Trust Company $13,500 was sold for $32,000 on February 23, 1918, to the Fourth National Bank and, therefore, a profit of $18,500 realized, no question being raised as to a March 1, 1913, value, or that the stock was acquired prior to March 1, 1913.

In a similar case, *Appeal of Farmers & Traders Bank*, 4 B. T. A. 753, the Board said:

It was a *bona fide* sale between two corporations, the consideration being cash and an enforceable obligation. The parties to the transaction made their own terms and the taxpayer must be bound by the same in so far as taxation may result on the profit of $9,840.

In the two subsequent sales, cost and selling price were the same, and, consequently, no profit resulted to be accounted for.

The next item is the contention of the Trust Company that it should be allowed a deduction of $15,000 in 1919 on account of such an amount being paid by it to secure the services of W. M. Davis and brother to carry on a stock and bond business. The resolution authorizing this transaction is to the effect that $5,000 was to be paid for the furniture, fixtures, and office supplies of the business formerly conducted by these individuals and $10,000 for the good will of their business. The testimony is to the effect that the Trust Company in seeking to establish a brokerage business negotiated with Davis and his brother because they had what was considered the best stock and bond house in Macon, Ga. These men discontinued their business and brought with them their office furniture and fixtures, which apparently had little value, and also their mailing lists. They came to the Trust Company and conducted for this bank the kind of a business which they had previously carried on in their own capacities. When the business as conducted by them proved unsatisfactory to the Trust Company, they were released from their contract, the business was discontinued and their office paraphernalia returned to them.

The Board is of the opinion that the foregoing expenditure was of a capital nature and represented an amount paid by the bank to secure what was, in effect, a going business. When, however, the business was discontinued in 1920, a loss was sustained on account of which the Trust Company is entitled to a deduction from gross

income. *Appeal of Metro Pictures Film Exchange of Pennsylvania*, 1 B. T. A. 721.

The item referred to in our findings of fact as a claim against E. N. Lewis and Mrs. Amos, represents another asset which was taken over by the Fourth National Bank from the Trust Company in the transaction of February 23, 1918, at its face value of $20,970.36. The testimony was to the effect that Mrs. Amos, the guarantor on the note securing this claim, was solvent at the time the claim was taken over, and, while the claim was then in litigation, counsel for the Fourth National Bank, after an investigation of the defense which Mrs. Amos was setting up, advised the bank that the defense was not good and the Fourth National Bank took it over at its face value. Subsequent to acquisition, additional information was secured which indicated that there might be some basis for the defense of Mrs. Amos. Then on advice of counsel, the claim was compromised out of court for $5,000 less than its face value.

We are of the opinion that such a reduction in the settlement of a claim represents a deductible loss under section 234 (a) (4) of the Revenue Act of 1918. *Appeal of George C. Peterson Co.*, 1 B. T. A. 690; *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168; and *Pacific Novelty Co.* v. *Commissioner*, 5 B. T. A. 1017.

In our opinion, the amount paid to the architect for preliminary plans of a building which it proposed to erect, but which plan was abandoned in the same year after the costs were determined, and has not since been carried into execution, is a proper deduction from gross income in the year when paid, namely, 1919. *Appeal of C. U. Connellee*, 4 B. T. A. 359.

No evidence was introduced at the hearing with respect to the loss on the Crawford-Morrow stock by the Fourth National Bank, this issue being submitted on the pleadings. The Commissioner admits that this stock cost $6,379.60 and that prior to its being charged off, $5,000 had been received and applied as a credit on account thereof, but denies that the stock was worthless when charged off by the Fourth National Bank. In the absence of proof that the stock was worthless as contended by the Fourth National Bank, the prima facie correctness of the Commissioner's determination must be sustained.

The final issue in the case involves a deduction claimed on account of a debt of E. F. Taylor which arose in 1919 and which the Fourth National Bank contends became worthless in 1920. The debt was charged off on February 28, 1920, on instructions from a national bank examiner, at which time the bank was of the opinion that recovery could be had on a part of the indebtedness.

Had the evidence presented as to the worthlessness of the debt been confined to the directions of the bank examiner who instructed the

bank to charge it off, it would have been necessary to deny the deduction. *Appeal of Murchison National Bank*, 1 B. T. A. 617, and *Appeal of Farmers & Traders Bank*, 4 B. T. A. 753. We have in addition, however, the fact that prior to December 31, 1920, this petitioner determined that there was no value attaching to the debt other than that which might possibly exist in the claims held by Taylor, which had only a nuisance value. The carriers were contesting the claims held by Taylor and the investigation made by the petitioner convinced it that the carriers had a defense which could not be overcome by Taylor, and that, therefore, the only hope of recovery lay in the possibility that the carriers would pay something in order to rid themselves of the various suits which had been filed against them.

We are convinced that the foregoing circumstances are sufficient to satisfy the terms of section 234(a)(5) as to a debt "ascertained to be worthless and charged off within the taxable year." The debt having been charged off in February, 1920, when it was considered worthless, it is obviously unnecessary to take any further action in this respect, when prior to December 31, 1920, it was determined that the debt was actually worthless. *Appeal of Mason Machine Works Co.*, 3 B. T. A. 745.

As to the determination of worthlessness, we are of the opinion that this was likewise in accordance with sound business judgment and amounted to a substantial compliance with the statute. In *Appeal of Egan & Hausman Co.*, 1 B. T. A. 556, the Board said:

In adjusting their accounts and debts business men are called upon to use sound business judgment and prudence and are justified in eliminating from their assets such accounts and debts as are past due and which they are satisfied that they can not realize upon within some reasonably determinable period. They do not have to await uncertain and future events, nor are they called upon to wait until some turn of the wheel of fortune may bring their debtors into affluence, or to enable the receivers of a bankrupt institution to eke out a liquidating dividend.

Likewise, in *Appeal of Pacific Pipe & Supply Co.*, 2 B. T. A. 870:

The possibility that a small part of the debt may ultimately be recovered will not prohibit the writing off of the debt as worthless for income-tax purposes when every consideration of good business directs that it be charged off.

Also see *J. W. Teasdale & Co.* v. *Commissioner*, 5 B. T. A. 1244, and *Fort Worth Warehouse & Storage Co.* v. *Commissioner*, 6 B. T. A. 536.

The deduction to be allowed in this instance in 1920 should be reduced by collections which were made during 1920, i. e., the allowable deduction is $54,707.66 less $2,120.50.

Redetermination should be made in accordance with the foregoing.

*Judgment will be entered on 30 days' notice, under Rule 50.*